**UNITED STATES of America,**
**Plaintiff,**

v.

**Robert B. CARROLL, Jr., Defendant.**

**Civ. A. No. 858.**

United States District Court
W. D. Arkansas,
Hot Springs Division.

Dec. 14, 1962.

See also 203 F.Supp. 423.

Charles M. Conway, U. S. Atty., Robert E. Johnson, Asst. U. S. Atty., Ft. Smith, Ark., for plaintiff.

Boyd Tackett, Texarkana, Ark., Atchley, Russell, Hutchinson & Waldrop, Texarkana, Tex., George E. Steel, Nashville, Ark., for defendant.

JOHN E. MILLER, Chief Justice.

On July 17, 1961, the United States filed its complaint containing four counts. In Count I plaintiff alleged that during the years 1956 through 1959 it conducted a program of soil conservation known as the Agricultural Conservation Program, pursuant to which payments and grants of aid were made to farmers carrying out certain prescribed soil conservation practices; that the program was conducted by the Department of Agriculture pursuant to the Soil Conservation and Domestic Allotment Act, as amended, and the regulations promulgated in connection therewith, which provides for payments or grants of other aid to farmers to assist them in carrying out on their farms prescribed soil conservation practices; empowers the Secretary of Agriculture to make available conservation materials consisting of seed, fertilizer, etc., to agricultural producers and to make payment therefor to persons (hereinafter referred to as vendors) who fill purchase orders for approved conservation materials in accordance with the provisions of the regulations.

Plaintiff further alleged that the defendant, Robert B. Carroll, Jr., was at all times pertinent to this action the owner of a business in Murfreesboro, Arkansas, operated under the firm name of Carroll Building and Appliance Company; that the defendant entered into written agreements with the plaintiff on Forms ACP-230, by the terms of which said defendant, as a vendor, agreed to furnish and to be paid for approved conservation materials and/or services to farmers to be utilized under the Agricultural Conservation Program in Pike and Howard Counties, Arkansas; that the defendant made claims upon and received payment from the plaintiff for the alleged delivery on purchase orders of substantial quantities of approved conservation materials to farmers during the years in question; that such payments made by plaintiff to defendant included $8,138.61, which defendant was not entitled to receive from plaintiff in that approved conservation materials in such amount had not in fact been delivered by defendant to said farmers in accordance with the requirements of the program; that said amount was erroneously paid to defendant by plaintiff on the basis of plaintiff's reliance upon material false representations made by defendant to plaintiff as to quality and quantity of approved conservation materials delivered by defendant to said farmers for use under the said program.

In Count II the plaintiff alleged as an alternative to the recovery sought under Count I that the defendant breached the terms of his contract with the plaintiff in that under the terms of said agreement the defendant was entitled to payment from the plaintiff only for approved materials and services actually furnished by him to farmers for use in the said program; and that he breached the contract by claiming from the plaintiff and receiving payment in the amount of $8,138.61, representing the Government's cost-share of quantities of seed and other conservation materials which did not conform to the requirements of the regulations for which seed or other materials were not in fact delivered by the defendant to the said farmers for use under the programs.

In Count III the plaintiff alleged in addition to the first two counts that the agreements provided that where a vendor willfully misuses a purchase order and it is so determined after a hearing by the State Committee, such vendor will be liable for liquidated damages in addition to other remedies available to the plaintiff, which liquidated damages under the terms of the agreement consist of the going commercial prices of the total quantity of all materials or services authorized to be furnished upon each purchase order so determined to have been misused; that the State Committee determined that a number of purchase orders submitted by the defendant to the plaintiff for payment under the Agricultural Conservation Programs for the years in question were willfully misused by the defendant as vendor in that the seed or other conservation materials represented as having been furnished by the vendor to farmers had not, in fact, been so furnished, or that the quality of such

materials furnished did not conform to the requirements of the program or the regulations; and that the defendant was given an opportunity to appear and did appear and testify before the State Committee, at which hearing such determination was made, and that the going commercial price of the total quantity of the material or service authorized to be furnished on the purchase orders so misused by the defendant as vendor amounted to $7,295.37.

In Count IV the plaintiff sued the defendant as a farmer for an additional sum of $3,941.48, which count was disposed of by summary judgment entered in favor of the plaintiff on April 9, 1962. See, United States v. Robert B. Carroll, Jr., (1962) W.D.Ark., 203 F.Supp. 423.

On August 2, 1961, the defendant filed his answer and counterclaim which was amended on May 17, 1962. In his answer the defendant admitted making the claims in question upon and receiving payments from the plaintiff in the amount of $8,138.61, but he denied failing to deliver on purchase orders the quantities in question of approved conservation materials to the farmers. He alleged, to the contrary, that he did deliver the approved materials in accordance with the requirements of the program and was entitled to the sum in question. He denied making material false representations as alleged by the plaintiff, and that if there were substitutions of seed and/or fertilizers in the filling of the purchase orders, that in no case did such substitution, if any, result in the delivery of material, service or conservation materials of an inferior quality, nor did such substitutions, if any, at any time result in delivery of less than the quantity authorized by the respective purchase orders, and that substitutions of such materials, if any, made in the filling of such purchase orders as contemplated by Count I of the complaint were made with the full prior knowledge, consent and acquiescence of the ASC Agent for Howard and Pike Counties, Arkansas.

In answer to Count II of the complaint, the defendant denied that he in anywise breached the terms of the agreement between him and the plaintiff, and realleged and reaffirmed his amended answer to Count I of the complaint.

In his answer to Count III the defendant denied that he willfully misused any purchase orders; that the State Committee had basis for any such conclusions; that he made claim or received payment for any materials not furnished; that the quality of the materials furnished did not conform to the requirements of the program or regulations; and realleged and reaffirmed the facts set forth in his amended answer to Count I of the complaint.

In numbered paragraphs III to VI in answer to Count III the defendant also alleged:

"III.

"Defendant further alleges that the only evidence before the State Committee at any hearing or hearings to which your defendant was invited and in which he participated, and the only legal evidence said Committee had before it as a basis of its determination and decision, if any, was:

"(a) Copies of the purchase orders filled by defendants as vendor.

"(b) An audit by plaintiff summarizing the data shown by the purchase orders referred to in Subdivision (a) of this numbered paragraph next above.

"(c) Invoices issued by this defendant's suppliers to defendant which reflected acquisition by defendant of some of the seeds and fertilizers used by defendant, as a vendor, to fill the purchase orders in question.

"(d) The testimony of defendant that he actually filled the purchase orders in

question by delivering to such farmers the respective seeds and fertilizers in quantities and of the grade and quality required.

"(e) The testimony of the defendant that he did not have and could not produce written invoices issued to him by his suppliers evidencing the acquisition by defendant of quantities of seed and fertilizers equal to the total quantity there reflected by the purchase orders in question.

"That if any further evidence than that set forth in subdivisions (a) to (e) inclusive of this numbered paragraph was presented to the said State Committee in connection with the allegations found in Count Three of Plaintiff's Complaint on file herein, then such evidence was adduced and/or produced without the knowledge of defendant, outside the scope of the hearing to which defendant was invited, and thus in violation of defendant's right to be confronted by his accusers, which right is guaranteed this defendant by Amendment Number Six of the United States Constitution, and his further right to cross examine those witnesses from which such evidence may have been adduced, or those by whom such evidence may have been produced, whichever the case may have been.

"IV.

"The contract and agreement between plaintiff and defendant to participate in the furnishing of conservations materials and services under the Purchase Order Plan (attached as exhibits to Plaintiff's Complaint) did not and do not obligate nor require this defendant to maintain adequate records to permit verification of purchases and acquisitions by this defendant from his suppliers of the seeds, fertilizers and conservation materials used and to be used by defendant in filling the purchase orders and providing the services in question. On the contrary, such contracts and agreements required this defendant to 'maintain adequate records to permit verification of purchase order transactions' only with the farmers holding such purchase orders.

"V.

"The determination by the State Committee, if any, of the matters upon which plaintiff's claim asserted in Count Three of its complaint is based, was made solely upon the fact that defendant could not make available invoices or other records showing that he owned or acquired fertilizers, seeds and conservation materials in quantities respectively equal to the total quantities thereof delivered by defendant to the farmers shown on the purchase orders in question, unless the State Committee in fact considered evidence and testimony offered at the hearing by said State Committee outside the presence and hearing of this defendant, the possibility of which has been heretofore pointed out, in which event such evidence and/or testimony was not legally before said State Committee, and therefore could not be considered as legal testimony upon which such State Committee could make its determination and decision.

"VI.

"Plaintiff's causes of action asserted in Counts One, Two and Three of its complaint are disputes involving questions arising under contracts entered into by the United States and the defendant, and the decision and determination referred to in Count Three of Plaintiff's Complaint, and upon which plaintiff's cause of action asserted in such Count Three was based, was a decision and determination of the State

Committee of the State of Arkansas (under the ASC program), which Committee was a duly authorized Board of plaintiff; and such decision and determination of said State Committee was not supported by substantial evidence, within the meaning and intendment of 41 U.S.C. 321."

In his amended counterclaim the defendant alleged that he was entitled to payment by the plaintiff of the sum of $1,069.00 for the amount of approved soil conservation materials delivered to farmers upon proper and lawful purchase orders filled during the year 1959, for which the plaintiff has refused to grant payment.

 However, when the present case was tried before the court, the defendant did not introduce evidence in order to sustain his burden of proof of the counterclaim, and therefore the court deems the counterclaim as having been abandoned by him.

On April 17, 1962, the plaintiff filed its motion for summary judgment on Count III of its complaint. On June 19, 1962, the plaintiff's motion was overruled by order of this court for the reason that the court found that there existed a genuine issue as to material facts.

On October 24 and 25, 1962, the case was tried to the court on the merits as to Counts I, II and III of the complaint. At the conclusion of the presentation of the testimony, the case was taken under advisement by the court, subject to submission by the parties of briefs in support of their respective contentions. The briefs have been received, and the court, having considered the pleadings, the testimony adduced at the trial, the exhibits and briefs of counsel, now makes and files herein its findings of fact and conclusions of law, separately stated.

## FINDINGS OF FACT

### 1.

The defendant, Robert B. Carroll, Jr., d/b/a Carroll Building and Appliance Company, is and has been an adult resident of Murfreesboro, Pike County, Arkansas, at all times pertinent to the present action.

The defendant has been the sole owner of his business for a number of years, and he has engaged in the sale of building materials, hardware, gas and electrical appliances, butane, and small farm supplies, such as seeds and fertilizers. Besides carrying on a business in which merchandise is sold on a cash or credit basis, the defendant, following the universal custom of general mercantile stores in Pike and Howard Counties, has also engaged in trading and swapping one material for another or accepting labor or equipment for material, and on these occasions there has been a lack of cash records of the transaction where it has balanced out to the satisfaction of the bargaining parties.

### 2.

On January 31, 1955, the defendant executed Form ACP-230, which is entitled "Agreement to Participate in the Furnishing of Conservation Materials and Services under the Purchase Order Plan," the provisions of which, inter alia, state:

"A. In consideration of the approval of this application the vendor represents and agrees as follows:

"1. That he will acquaint himself with the regulations and instructions issued by the applicable State and county committees for the furnishing of materials and services under purchase orders and he will act only in conformity therewith.

\* \* \* \* \* \*

"4. That, upon request of a duly authorized representative of the US Department of Agriculture to examine pertinent records of the firm, he will permit such examination of all such records and will maintain adequate records to permit verification of purchase order transactions.

\* \* \* \* \* \*

"6. That he will furnish under purchase orders only materials and

services which meet the specifications set out on such purchase orders, and that he will comply with all Federal and State laws governing the sale and distribution of the material or service so furnished pursuant to such purchase orders.

\* \* \* \* \* \*

"8. That he will deliver the material or service specified in each purchase order to the person who is named therein or his authorized agent, and to no other.

\* \* \* \* \* \*

"12. That he will not permit or contribute to the substitution of any other material or service in lieu of that specified on such purchase order.

"13. That he will not deliver any lesser quantity or quality of material or service then authorized on a purchase order in order to permit the farmer thereby to reduce his contribution.

\* \* \* \* \* \*

"16. That in the delivery of materials and services authorized on a purchase order he will not deliver material or service of an inferior quality or deliver less than authorized thereon and claim payment for the greater quantity or quality authorized to be furnished on such purchase order. It is understood that should a lesser quantity or quality be delivered than is authorized on the purchase order, the vendor will enter the actual quantity and quality delivered and refer the purchase order to the county office for correction in the payment by the farmer and Government. It is further understood that if it is found that a lesser grade of material or service is furnished than authorized on the purchase order, such material or service may be rejected and the vendor shall not be entitled to payment therefor by the Government. At the option of the State committee such materials or services may be accepted and payment made therefor subject to a deduction equal to the difference between the fair price if applicable, or the going commercial price, if a fair price is not applicable, of the material or service of the quality specified and the value of the material or service furnished.

"Where it is determined by the State Committee that the purchase order was wilfully misused, any material or service authorized on the purchase order may be rejected and the vendor shall not be entitled to payment therefor by the Government; provided, that where it is accepted, the credit to which the vendor is entitled from the Government shall not exceed the amount of the Government's share of the cost of such materials or services accepted by the Government under the purchase order. In no case will payment be made for a material or service furnished on purchase order which does not meet the minimum specifications for carrying out the practice as set out in the State program handbook.

"It is understood and agreed that in the event the vendor shall wilfully use any purchase order contrary to the foregoing, the actual damage to the Government for such misuse will be impossible to determine, particularly since the vendor is also furnishing materials and services on other purchase orders which could also have been misused, the vendor in lieu of actual damages shall be liable to the Government for fixed, agreed, and liquidated damages in the amount of the fair price, if one is applicable, or the going commercial price, if a fair price is not applicable, of the total quantity of the material or service authorized to be furnished on each purchase order misused, and the vendor shall pay the amount thereof. Such damages shall be assessed and collected by the State committee only after the vendor has been given an opportunity to be heard by the committee and to

present such facts as may explain the circumstances, and the decision of the State committee as to whether there was a misuse and whether it was wilful shall be final and conclusive. It is understood that the assessment and collection of liquidated damages shall in no way bar or mitigate any other remedies the Government may have for breach of any other provisions of this agreement or for any violations of the federal statutes."

The above contract was to be carried out in Pike County and on a later date the defendant executed a similar agreement for purposes of participating in the program in Howard County.

After executing the above agreement, the defendant, d/b/a Carroll Building and Appliance Company, participated as a vendor under the Agricultural Conservation Program of the Department of Agriculture during the years 1956, 1957, 1958 and 1959, during which time he delivered quantities of seed, fertilizer, and conservation material to farmers at such times as they presented their purchase orders to him, and the defendant in turn made claims upon the plaintiff by certifying compliance with the requests of the purchase orders and received payment from the plaintiff in satisfaction of his claims.

### 3.

The procedure whereby a farmer obtained seed, fertilizer and conservation materials from a vendor, and the vendor received payment from the United States operated in the following manner. A farmer needing seed, fertilizer, or conservation materials contacted the agent or manager of the County Agricultural Service Committee, who filled in a purchase order, Form ACP-250, addressed to a vendor of the farmer's choice and containing the name of the farmer and the farmer's serial number, the date before which the delivery must be completed, the type of delivery, the number of acres for which the materials were furnished, the cost-share, rate and unit, the specifications of the material or service

order, which in the case of seed contained a blank for a lot number to be filled in by the vendor, the quantity authorized, the cost-share value of the units authorized, and the maximum payment to be made by the Government. The farmer then took his partially completed purchase order to the named vendor, and upon delivery of the authorized amount of the materials specified, the vendor filled in the amount actually furnished, the fair price or sales price per unit of the quantity, the total maximum cost and the maximum payment by the farmer. In the case of approved or certified seed the vendor also filled in the lot number of the seed delivered. The farmer, upon delivery of the materials, signed the purchase order certifying that the materials, as described, were received by him and would be used in carrying out the approved practices under the Agricultural Conservation Program for which they were furnished, and the date of the receipt of the material or service.

After filling the purchase order, the vendor reported the transaction to the County Committee Agent, who then completed a Form ACP-251 entitled "Purchase Order Delivery Summary and Claim for Payment," on which the County Committee Agent entered the name of the vendor and his address, date of delivery, payee's account number, the type of material or service furnished, the farmer's name and serial number, the quantity of the material delivered and the amount to be paid by the Government. This form was signed by the vendor who certified that the material or service was delivered during the period shown, that it met the specifications set out in the purchase order, that the above bill was correct and that payment therefor had not been received. The form also was signed by the County Committee Agent who certified that the reports by the vendor were true, that the material or service had been furnished to farmers listed thereon as evidenced by the purchase order executed in conformity with regulations of the Department of Agri-

culture, and that the Committee recommended that payment be made to the vendor in the amount claimed.

4.

As standard operating procedure, the County Committee Agent made semi-annual spot checks on the vendors within his jurisdiction, which spot checks were made at a time when the vendor would be expected to have recently filled some purchase orders which had not been transmitted to the County office. The County Committee Agent for Pike and Howard Counties ran spot checks upon the defendant on the following dates: March 27, 1956; October 5, 1956; March 25, 1957; October 1, 1957; March 21, 1958; October 7, 1958; and March 24, 1959. The spot checks were concerned with the proper completion of purchase order forms, the receipt for materials by the farmer not actually delivered, maintenance of adequate records by the vendor to permit verification of purchase order transactions, any other failures to comply with provisions of purchase orders, and a personal visit to one or more farmers for whom recent delivery of materials had been made to determine whether a delivery in fact had been made, and whether the quantity and quality of the material delivered was as indicated on the purchase order in question.

The reports of spot checks of the defendant's transactions as vendor carried out on the dates prior to March 24, 1959, disclose no failures to comply with defendant's agreement as executed on Form ACP–230. However, the report of spot checks of March 24, 1959, disclosed possible technical errors in the procedure and the Department called in the Compliance and Investigation Division, which sent a special investigator to Pike and Howard Counties in order to determine whether or not the defendant had complied with the terms of his agreement and the regulations of the Department of Agriculture in filling purchase orders for conservation materials and submitting claims for payment by the Government thereon.

The investigator during July and August, 1959, conducted a complete audit of the defendant's invoices and sales slips for quality and quantity of seed and fertilizer received and sold by him, and by checking records of supplies to verify those invoices which were not complete in themselves. When the investigator compiled the totals of quantity and quality of seed and fertilizer supplied to the defendant during the period in which he filled purchase orders, he formed an opinion to the effect that defendant could not have filled purchase orders with the quality and quantity of approved seed and fertilizer in compliance with his agreement with the Department of Agriculture, as well as with his certification of each delivery as being in compliance with the Department regulations. In other words, the report of the Compliance and Investigation Division, as prepared by the special investigator, indicated an over-all shortage of several materials when compared with the quantity purchased as reflected by the vendor's records with the quantity for which he filed claims for payment on Form ACP–251. There was also an indication that uncleaned and untested seed may have been used to fill purchase orders in some cases in violation of State Plant Board regulations, the CMS procedures, and the vendor's agreement. An analysis by the special investigator of the individual producer accounts in the vendor's records also indicated to him failure to properly fill purchase orders in a number of instances.

5.

On December 17 and 18, 1959, the State Committee met and reviewed the report of the Compliance and Investigation Division the pertinent parts of which and tabulations prepared therefrom indicated that a willful misuse of purchase orders by the defendant might be an appropriate finding. It was decided that a notice should be sent to the defendant advising him of the contemplated action of the State Committee and giving him an opportunity to be heard by the State Com-

mittee and to report such facts as he may have to explain the circumstances.

On January 21 and 22, 1960, the defendant appeared before the Committee. The provisions of his agreement on Form ACP–230 were reviewed with him. He was advised of the report that the investigator had compiled with particular reference to his shortages of suppliers' invoices, but the investigator was not present to testify in person. He was advised that he should present to the State office all records of purchases of all materials used by him in filling purchase orders during the period under investigation.

Subsequent to this meeting the defendant delivered to the State office documents which he claimed represented his purchases of seed and fertilizer during the period covered by the investigation report and for which he had not received credit. The Committee accepted some of the documents and rejected others which they thought contained insufficient information as to the quantity and quality of materials allegedly supplied to the defendant.

On February 4 and 5, 1960, the State Committee met and reviewed the additional information obtained by them, as well as the information that had been available to them earlier. Their conclusion was stated in part as follows:

" * * * Based on the information included in the investigation report and that presented by Mr. Carroll, it was noted that the quantity of materials purchased was substantially less for many materials than the quantity which the vendor claimed was delivered to farmers. It was decided that the State Office should proceed in computing amounts to be recovered from the vendor. In computing these amounts, liquidated damages should be computed for those purchase orders for which the vendor filed claim for payment but which could not have been filled as indicated with the materials available. In many cases there appears to be shortages in deliveries to farmers which cannot be identified to specific purchase orders. In cases of this nature the amount of Government payments made for materials which could not be delivered because the material was not available should be recovered. In a few instances the vendor claimed the purchase of seed which were not identified to a seller or for which no quality information was available, including uncleaned and untested seed."

In compliance with instructions of the State Committee, a preliminary computation of liquidated damages and overpayments in the defendant's case was made. For purposes of computation in each category of materials in which there was a claimed over-all shortage of that which was invoiced to the defendant by his suppliers and that with which he filled purchase orders, the auditors arbitrarily selected for refund and/or liquidated damages a number of purchase orders, the total of which would equal the amount of the particular difference or shortage. In other words, none of the auditors or the investigator were able to pinpoint any particular purchase order which had not been properly filled for the reason that they had no direct evidence by way of complaints from farmers, periodic spot checks, or otherwise, so that it was necessary for them to designate at random those purchase orders which they deemed not to be filled properly. These computations were reviewed by the State Committee on February 17 and 18, 1960, and the procedures followed by the auditors in determining the going commercial prices of materials, liquidated damages and shortages of materials were approved by the State Committee. At that time it was decided that the defendant, as vendor, should be notified of the amounts to be refunded, that is, $8,138.61, consisting of overpayments by the Government on the purchase orders for which payment was claimed by the defendant, and for $7,295.37 in liquidated damages as payment for willful misuse of purchase orders by the vendor.

## 432

### DISCUSSION

█ Jurisdiction of this action is granted by 28 U.S.C. § 1345.

Counts I and II will be considered together since they are alternative counts, and, generally speaking, involve the same issue or question. That issue is whether an inference that Carroll did not make delivery to farmers of seed and fertilizer in the quantities and qualities stated in the various purchase orders for which he received payment is supported by a preponderance of the evidence.

The only conclusive fact proved by the plaintiff which could support such an inference is that Carroll did not have and could not produce written invoices issued to him by his suppliers evidencing the acquisition by him of quantities of approved seed and fertilizer equal to the total quantity sold to farmers as indicated by the purchase orders in question.

In order to arrive at this ultimate inference of non-compliance with the purchase orders, the plaintiff advances an intermediate inference based on the proven lack of supporting invoices that Carroll had not obtained sufficient quantities of approved seed and fertilizer with which to fill the purchase orders. Thus, absent any direct evidence to support the conclusion of Carroll's liability for erroneous payment or breach of contract, the court must find that these two successive inferences are supported by the preponderance of the evidence before it can arrive at such conclusion.

Opposing such a conclusion, the defendant relies on an inference of compliance based upon the fact that every farmer-purchaser testified that he received to his satisfaction the quantity and quality of materials which the purchase orders called for. Thus, the court must determine whether it is justified in drawing an inference of full compliance by the defendant, based upon the established fact that the defendant, as vendor, filled the purchase orders presented to him to the satisfaction of the farmers, and whether it is justified in

concluding that the defendant is thereby absolved of any liability as alleged by the United States in Counts I and II of its complaint.

█ The general rule relating to inferences is stated in 32 C.J.S. Evidence § 1044, as follows:

"A verdict or finding may be based on reasonable inferences fairly drawn from the facts in evidence, and a material fact need not be proved by direct evidence; it is sufficient if there is evidence from which the fact can properly be inferred. The triers of fact may draw all reasonable and legitimate inferences and deductions from the evidence adduced before them; indeed, it is their duty to make, and give consideration to, all inferences and deductions which may properly be drawn. A reasonable inference is as truly evidence as the matter on which it is based, and is not a mere presumption or guess; appropriate inferences from proved facts are not a low order of evidence, and whether or not they should be permitted to overcome positive and direct testimony depends, in every case, on the relative strength of the one or the other.

"An inference can be drawn only from the facts in evidence, and cannot be based on surmise, speculation, conjecture, or guess; it must be reasonably drawn from, and supported by, the facts on which it purports to rest, and must be made in accordance with correct and common modes of reasoning. An inference has been required to be based on probabilities, and not on mere possibility or possibilities; but according to other authorities, probabilities, as distinguished from facts proved, will not support an inference.

"An inference is to be considered in connection with all other facts which may weaken or strengthen it. An inference is unjustified and without probative force if it is inconsistent with undisputed or clearly

established facts, or is contrary to direct, positive, and uncontradicted testimony. Evidence which is consistent with direct, positive, and otherwise uncontradicted testimony that a fact does not exist will not support an inference that it does, and an inference should not be adopted from a few of the facts proved when it is absolutely inconsistent with, and repelled by, other equally well proved facts. It has also been said that 'the susceptibility of a fact to produce an inference must be denied, when the probative force or effect of that inference may be wholly frustrated, at the option of the one to be affected by it.'

"Overcoming inference. A permissible inference may be overcome by proof to the contrary; but an inference is not overcome by contradictory evidence which is vague or uncertain or is weakened by contradictions or improbabilities."

The same rule is thoroughly analyzed by a three-judge court in the case of United States v. United States Gypsum Co., (D.D.C.1946) 67 F.Supp. 397, reversed on other grounds, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746, beginning at page 449 of 67 F.Supp. as follows:

"* * * Inferences must be reasoned inferences, otherwise a case is not decided according to law. Certain principles have been recognized by the courts with reference to the dependability of inferences. They safeguard the integrity of ultimate facts arrived at by inference. These principles, authoritative guides to every trier of fact, whether jury, court or commission, are the following:

"(1) An inference to be reasonable must be warranted from all the evidence, otherwise a fact reasonably inferable from a single fact or group of facts might be inconsistent with the totality of proven or conceded subsidiary facts. As said in National Labor Relations Board v. Union Pacific Stages, 9 Cir., 1938, 99

F.2d 153, 177, where the court interpreted the meaning of Section 10(e) of the National Labor Relations Act, 29 U.S.C.A. § 160(e), providing that 'the findings of the Board as to the facts, if supported by evidence, shall be conclusive': 'But the courts have not construed this language as compelling the acceptance of findings arrived at by accepting part of the evidence and totally disregarding other convincing evidence.' In short, a trier of fact may not ignore a part of the evidence. In National Labor Relations Board v. Thompson Products, 6 Cir., 1938, 97 F.2d 13, 15, the court said in respect of Section 10(e) of the Act: 'It means that the one weighing the evidence takes into consideration all the facts presented to him and all reasonable inferences, deductions and conclusions to be drawn therefrom and, considering them in their entirety and relation to each other, arrives at a fixed conviction. * * * Testimony is the raw material out of which we construct truth and, unless all of it is weighed in its totality, errors will result and great injustices be wrought.'

"(2) If two equally probable but inconsistent inferences may be drawn from the same facts, a finding of fact cannot reasonably be based upon either of them; in such a situation the evidence is equivocal. Pennsylvania R. Co. v. Chamberlain [288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819], cited in topic I of this opinion. In that case the Court said: 'We, therefore, have a case belonging to that class of cases where proven facts give equal support to each of two inconsistent inferences; in which event, neither of them being established, judgment, as a matter of law, must go against the party upon whom rests the necessity of sustaining one of these inferences as against the other, before he is entitled to recover. [Citing authorities]' (288 U.S. at page 339, 53 S.

Ct. at page 393, 77 L.Ed. 819) Cf. Cupples Co. Manufacturers v. National Labor Relations Board, 8 Cir., 1939, 106 F.2d 100.

"(3) Where two different inferences may be drawn from undisputed facts, that which is the more probable is the one which must be drawn. National Labor Relations Board v. Sands Mfg. Co., 1939, 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682; Appalachian Electric Power Co. v. National Labor Relations Board, 4 Cir., 1938, 93 F.2d 985.

"(4) A fact may not be inferred from a proven fact or facts where unimpeached and uncontradicted testimony consistent with such proven fact or facts but inconsistent with the fact sought to be ·inferred, is in the record. [Citing cases.] This proposition was phrased as follows in the Pennsylvania Railroad case: 'And the desired inference is precluded for the further reason that respondent's right of recovery depends upon the existence of a particular fact which must be inferred from proven facts and this is not permissible in the face of the positive and otherwise uncontradicted testimony of unimpeached witnesses consistent with the facts actually proved, from which testimony it affirmatively appears that the fact sought to be inferred did not exist. * * * A rebuttable inference of fact, as said by the court in the Wabash Railroad case [Wabash R. Co. v. De Tar, 8 Cir., 1905, 141 F. 932, 935], "must necessarily yield to credible evidence of the actual occurrence." And, as stated by the court in George v. Missouri Pac. R. Co. * * * [1923, 213 Mo.App. 668, 674, 251 S.W. 729, 732], "It is well settled that where plaintiff's case is based upon an inference or inferences, * * * the case must fail upon proof of undisputed facts inconsistent with such inferences."' (288 U.S. at pages 340, 341, 53 S.Ct. at page 394, 77 L.Ed. 819) In the

Cupples Co. Manufacturers case the court stated: 'evidence which merely furnishes grounds for suspicion and conjecture proves nothing, and * * * the Board, like a jury, may not disregard the uncontradicted testimony of unimpeached and credible witnesses.' (106 F.2d at page 105) In the Foote Bros. Gear & Mach. Corp. case the court said: 'In reaching our conclusion we wish to make it clear that * * * (c) A statement which alone may afford substantial support for a fact finding may lose its weight entirely in the face of uncontradictd facts inconsistent with it.' (114 F.2d at page 622).

"In short the rules of logic and reasoning which are necessary to the accomplishment of the type of adjudication guaranteed under our system of law must be applied by every trier of fact in reaching findings. [Citing cases.]"

In Arkansas the rule is stated in the case of Ft. Smith Gas Co. v. Blankenship, (1937) 193 Ark. 718, 102 S.W.2d 75, beginning at page 721 of 193 Ark., at page 76 of 102 S.W.2d, as follows:

"The indulgence of inferences will not supply a nonexistent fact. Inferences to support a verdict arise out of facts established by evidence. Other inferences are purely speculative, or maybe guesswork or conjecture. This method of dealing with the rights of parties has been condemned by many decisions. Standard Pipe Line Co. v. Burnett, 188 Ark. 491, 66 S.W.2d 637; St. L., I. M. & S. Ry. Co. v. Hempfling, 107 Ark. 476, 156 S.W. 171; Denton v. Mammoth Spring, E. L. & P. Co., 105 Ark. 161, 150 S.W. 572; Ft. Smith, Light & Traction Co. v. Cooper, 170 Ark. 286, 280 S.W. 990; Turner v. Hot Springs Street Ry. Co., 189 Ark. 894, 75 S.W.2d 675; Lewis v. Jackson, 191 Ark. 102, 83 S.W.2d 69.

"A consideration of the sound principles announced in the above-

cited cases and of many other similar authorities impels us to hold the court erred in failing to direct a verdict for the defendant upon this matter."

See, also, Heekin Can Co. v. Kimbrough, (W.D.Ark.1961) 196 F.Supp. 912; and Williams v. Oklahoma Tire & Supply Co., (W.D.Ark.1949) 85 F.Supp. 260.

█ Therefore, in view of the basic facts as proven in the instant case and the applicable rule governing inferences to be drawn from these facts, the court is of the opinion that the plaintiff has failed to sustain its contention that the defendant failed to comply with the terms of his agreement with the plaintiff and with the applicable statutes and regulations. The reason for this conclusion is that plaintiff has not sustained this ultimate inference by a preponderance of the evidence by merely proving the defendant's shortage of suppliers' invoices and thus implying by this fact that the defendant could not have obtained the necessary approved conservation materials with which to fill the purchase orders in question. Even if it be conceded that the plaintiff made out a prima facie case, the positive testimony of every farmer-purchaser who had used the purchase orders in question that in no case were the materials purchased from the defendant deficient as to quantity and quality is altogether sufficient and convincingly rebuts the contention of plaintiff. The inference of delivery by defendant of sufficient quantities of approved materials in filling the purchase orders in question is definitely and positively established by the testimony of unanimously satisfied customers.

█ There were present at the trial 40 farmers of a total of 43 who had obtained from the defendant seed, fertilizer and other conservation materials upon purchase orders. The 40 purchasers were present to testify in behalf of defendant, and the three who were not immediately present were available as witnesses. When this information was conveyed to the court, the court suggested that a representative few of the farmers be called as witnesses, and the parties agreed to such suggestion, and accordingly the defendant called as witnesses four representative farmer-purchasers. Each of them testified fully and frankly as to the quantity and quality of the materials received by him, and in order to avoid cumulative testimony, it was agreed that the other farmers present would, if called, testify substantially as the four who were called and testified. Reference has heretofore been made to the testimony of the farmer-purchasers. As the trial progressed, at least one of the Government witnesses, who had aided in the investigation, testified very frankly that in his opinion the farmers ofttimes were unable to distinguish noxious weeds and impure and defective seed and other supplies from the quality required under the contract to be furnished by the defendant. The Government witness further testified that it was impossible for them to check with all of the farmer-customers because they had not retained the certificates that were attached to the sacks containing the seeds or the analysis attached to the sacks containing fertilizer, and therefore they assumed that the farmers did not in fact receive from the defendant the approved materials. At least one of the farmer-purchasers who testified was a graduate of an agricultural college and a teacher. The others who testified were men of experience and successful farmers, and the assumption on the part of the investigator and the other employees of the plaintiff who made this investigation was entirely without any basis. It is common knowledge that the average farmer of today is astute, and in order to succeed as a farmer must be sufficiently versed in the virtues of seed and fertilizer and other conservation materials. It is inconceivable that had the defendant furnished any uncleaned or uncertified seed or any other nonapproved materials, the farmers would not have complained. In fact, the County Agent would have been the first man to have learned of these complaints, and had there been any basis for the contention of the plaintiff that the defendant

did not furnish the quality and quantity of materials required, it could have been established beyond the peradventure of a doubt.

Assuming that the evidence is sufficient to justify an inference of noncompliance by the defendant, there would still remain the question of damages. As stated in finding of fact No. 5, the auditors arbitrarily selected for refund and/or liquidated damages a number of purchase orders, the total of which would equal the amount of the alleged particular difference or shortage. In other words, none of the auditors or the investigator was able to pinpoint any particular purchase order which had not been properly filled for the reason that they had no direct evidence by way of complaints from farmers, periodic spot checks, or otherwise, so that it was necessary for them to designate at random those purchase orders which they speculated and imagined had not been filled properly. Under his purchase order agreement with the plaintiff, the defendant was to be held liable for deficiencies in filling particular purchase orders. If deficiencies in specific items were incapable of computation, then the defendant would be liable for liquidated damages which would be collectible only under Count III of the complaint upon the additional proof of willful misuse of the purchase orders in question by the vendor.

The issue presented by Count III is whether, under the terms of the purchase order agreement, the defendant should be held liable for liquidated damages for willful misuse of the purchase orders because of the finding by the State Committee.

In this connection, the purchase order agreement executed by the defendant, as heretofore set forth in finding of fact No. 2, stated that the decision of the State Committee as to whether there was a willful misuse would be final and conclusive.

Since the present case was tried to the court on its merits on all three counts, the primary question to be decided in considering the claims of plaintiff, as alleged in Count III of the complaint, is whether the provision of the purchase order agreement, making the State Committee's findings final and conclusive, controls the rights of the parties and restricts the scope of the court's determination of this particular issue to a mere review of the State Committee's findings as being a final agency action.

Absent any common law or a statutory interpretation of such provisions of purchase order agreements, this court must turn to decisions which have dealt with the effect of statutory provisions declaring administrative findings final and conclusive. Such a statute is 38 U.S.C. § 705, as contained in the Servicemen's Readjustment Act of 1944, as amended.

In the case of United States v. Owens, (E.D.Ark.1957) 147 F.Supp. 309, the United States was suing a veteran for recovery of a sum of money paid him as an unemployment benefit to which the United States claimed he was not entitled, this claim being based upon a Veterans Administration finding that the defendant had knowingly misstated his income in order to receive such sum. In the case, Judge Lemley held that the court was not bound by the administrative finding in a suit brought by the United States, and as tried on the merits, the United States failed to sustain its evidentiary burden. The court stated its reasons for disregarding the administrative findings as follows, beginning at page 314 of 147 F.Supp.:

" * * * In our opinion that enactment accords prospective finality only to findings and conclusions of the Veterans' Administration and applies only where judicial review thereof is sought against the Government, and not where, as here, the Government is seeking affirmative judgment for the recovery of money. To hold otherwise might raise grave constitutional doubts as to the statute's validity; as was said in Hormel v. United States, D.C.N.Y., 123 F. Supp. 806, 810: ' * * * the Gov-

ernment's construction as applied to this case raises the serious question whether the Fifth Amendment would not invalidate a law which would permit the Government to recover a judgment against a citizen without giving him an opportunity to challenge the bare assertion of an administrative officer that money was due and owing. \* \* \* '

\* \* \* \* \* \*

"Moreover, the idea that the Government by means of an informal administrative hearing such as was conducted in this case can create for itself an unassailable cause of action for the recovery of money, and enforce that claim in the courts, while prohibiting the defendant from being heard therein on the merits, is clearly repugnant to fundamental notions of fair play and to our concept of this nation as one of free men having rights against their government which the courts can and will protect; and it is likewise repugnant to those great principles of natural law and justice that undergird our system of jurisprudence, not the least of which principles is that no man should be a judge of his own cause.

\* \* \* \* \* \*

"We, of course, do not question that if the Government makes a proper evidentiary showing, a veteran who has received payments improperly is liable to make restitution thereof; but we do not think that the Government can use an administrative determination of the Veterans' Administration as a substitute for evidence, thus raising itself, so to speak, by its own boot straps."

Judge Lemley's decision in United States v. Owens, supra, was cited with approval by Judge Holtzoff in the case of Gongora v. United States, (D.D.C.1960), 183 F.Supp. 872, in which the court stated at page 873 as follows:

" \* \* \* The Government relies on the provisions of law according finality to the decisions of the Veterans Administration in respect to gratuitous payments to veterans and members of their families. The Court is of the opinion that provisions relating to finality are applicable solely to cases in which a claim is presented against the Government, but does not extend to affirmative claims made by the Government to secure repayments. In other words, the finality provisions may be used as a shield, but not as a sword. Otherwise, in cases such as this, the Court would have no function to perform except to enter judgment for a specified sum on the basis of the administrative ruling, United States v. Owens, D.C., 147 F.Supp. 309; United States v. Lawrence, D.C., 154 F.Supp. 454."

In the instant case the United States, as plaintiff, is relying on a contract provision rather than on a statutory provision. Furthermore, the State Committee's finding of willful misuse of certain purchase orders by the defendant Carroll was based mainly upon the report of the investigator whom Carroll had no opportunity to cross-examine until the case was tried to the court. In view of the above stated rules and reasons, this court is of the opinion that its consideration of the merits of Count III of the complaint is not restricted by any provision of the purchase order agreement executed by the defendant.

Turning to the main issue as presented by Count III, the court, in order to find for the plaintiff, would not only have to find that the plaintiff had sustained its burden of proof as outlined in the discussion of Counts I and II, which it clearly has not done, but it had established by a preponderance of the evidence an additional inference of a willful misuse of the purchase orders by Carroll.

Willful is defined by Black's Law Dictionary as: "Proceeding from a conscious motion of the will; voluntary; \* \* \* intending the result which actually comes to pass; designed; intentional; not accidental or involuntary." As stated in its discussion of Counts I

and II, the court is of the opinion that the United States, as plaintiff, cannot establish the conclusion of defendant's liability by a chain of inferences based upon the proven fact of Carroll's lack of invoices from each and every supplier, and since the element of willful misuse must depend upon an additional inference with no more to support it than the prior inferences to be drawn from the same proven fact, thus it, too, must fail. Furthermore, the evidence presented by the defendant consisting of testimony by farmers that the defendant had filled the purchase orders in question to their satisfaction, both as to quantity and quality of materials called for, rebutted these inferences and overcame any prima facie case which the plaintiff may have established that there was misuse, willful or otherwise, of the purchase orders by the defendant.

## CONCLUSIONS OF LAW

1.

The court has jurisdiction of the parties to and the subject matter of this cause of action.

2.

The United States has failed by a preponderance of the evidence to establish under Counts I and II that its payments of $8,138.61 to Robert B. Carroll, Jr., were erroneous, or that Carroll haa breached his purchase order agreement in the same amount by his failure to fill the purchase orders in question.

3.

The provision of the purchase order agreement signed by Carroll, making the finding by the State Committee of willful misuse of purchase orders final and conclusive, does not make such finding final and conclusive in the instant action and does not of itself establish the plaintiff's claim.

4.

The United States has failed to prove by a preponderance of the evidence, under Count III, that Robert B. Carroll, Jr., is liable for liquidated damages in the sum of $7,295.37 for willful misuse of the purchase orders in question.

Therefore, a judgment dismissing Counts I, II and III of plaintiff's complaint is being entered today.