In re Gregory S. KOJOYIAN, Debtor.

Jeffrey UVEZIAN, Plaintiff,

v.

Gregory S. KOJOYIAN, Defendant.

Bankruptcy No. 80–00164–G.
Adv. No. 4–80–0069.

United States Bankruptcy Court,
D. Massachusetts.

Dec. 16, 1980.

Joan N. Feeney, Boston, for plaintiff, Uvezian.

Jay Z. Aframe, Worcester, for defendant, Kojoyian.

## MEMORANDUM AND ORDER REGARDING COMPLAINT TO DETERMINE NON–DISCHARGEABILITY OF A DEBT

PAUL W. GLENNON, Bankruptcy Judge.

This matter came on for trial on August 4, 1980 upon the complaint of Jeffrey Uvezian ("Uvezian") to determine that a debt owing to him from the debtor, Gregory Kojoyian ("Kojoyian") be declared non–dischargeable pursuant to § 523(a)(2) of the Bankruptcy Code (11 U.S.C. §§ 101, et seq.). The plaintiff alleges that he gave a sum of money to the defendant after relying upon false and misleading representations of the defendant and that this constituted actual fraud, wherefore the debt should not be discharged in bankruptcy. The facts in this case are highly convoluted and difficult to determine with precision. The testimony of both parties is riddled with inconsistency and seeming inaccuracy. Much of the testimony on each side does not fit together or adequately explain those facts which are uncontroverted. The case involves two distinct and opposing accounts about an exchange of a large sum of money, which was never returned to Uvezian. The confusion arises out of each party's explanation of the motivation behind the transaction and the course of subsequent events. Without saying more at this time, I questioned the credibility of both Uvezian and Kojoyian in regard to certain testimony which I shall refer to below. The court, as finder of fact in this case, had the opportunity to observe each witness and to examine the record. I conclude that neither party's explanation of the events in this case is totally forthright or complete. While there may be more to this matter than has been adduced at trial, the court does not wish to speculate as to facts which do not appear from the record. May it suffice to say that I am not satisfied that the whole truth has come out at any time in this proceeding. I shall explain my observations more freely below, but I wished first to preface my findings of fact with these remarks.

## FACTS

The plaintiff, Uvezian, is a creditor of Kojoyian in the amount of $13,109.68, $12,500 of which he seeks to have excepted from discharge. This last amount, it is agreed, was given to Kojoyian by Uvezian on December 9, 1977, purportedly to be applied by Kojoyian toward the purchase of a 1947 Rolls Royce automobile. In this regard, an attorney was consulted to draft an agreement whereby Uvezian would advance the $12,500 to Kojoyian for the purpose of purchasing the automobile. Uvezian's contribution was to represent a 50% interest in the antique auto or, if the auto could not be purchased within 30 days, Kojoyian was to return the money upon demand to Uvezian. This was the agreement as set out in writing and signed by both parties.

The plaintiff alleges that he signed the above agreement on the basis of defendant's representations that a 1947 Rolls Royce could be purchased from a Springfield, Massachusetts woman for $25,000 and re–sold for a profit. Plaintiff and defendant had known each other for a short time in college and were, at the time of the agreement, temporary roommates. Uvezian alleges that he later discovered that no such automobile existed and that defendant intended to defraud him from the beginning.

Kojoyian has admitted that no car existed and that he never intended to buy any automobile, but that Uvezian was fully aware of this fact. The defendant's story is that he entered into the written agreement with Uvezian to accommodate the plaintiff. He says that Uvezian was involved in a proposed business venture with one Erwin Cantor for the purchase of a nightclub and that Uvezian came to him with a proposal regarding a mock purchase agreement, so that Uvezian could show that his assets were tied up, and thereby avoid committing funds to this new business. Kojoyian's story is that neither side intended to buy an antique car and that both knew no car existed. The written agreement was a sham to fool Cantor. Kojoyian was to hold the money for Uvezian until such time as he asked for it. Uvezian, on the other hand, avers that the agreement is exactly what it purports to be.

The plaintiff next alleged that when he asked that his money be returned, Kojoyian told him to meet him at a hotel. Upon arriving there, Uvezian says Kojoyian "staged" a robbery with some other men and Uvezian never received his money back.

The defendant's story is that he received the cash from Uvezian and took it to his parents' home in Westboro, Massachusetts, that after a period of time Uvezian told him his business deal was going to fall through, and that he was asked to return the money. Kojoyian says he did return the cash to Uvezian but not at any hotel. Moreover, he alleges that his girlfriend, Deborah Khoury, was present with him when he delivered the money to Uvezian. In that regard, attorney Michael Pessia testified regarding certain statements made to him by Miss Khoury which, after objection to their admissibility, were taken under advisement. Miss Khoury died on September 11, 1978 due to an overdose of Amylbarbitone, and could not testify at the trial.

The plaintiff, herein, filed a complaint in the Boston Municipal Court and after a full trial on the merits, judgment was awarded Uvezian in the amount of $13,109.68. The state court found Uvezian advanced $12,500 to Kojoyian with the understanding that upon purchase of a 1947 Rolls Royce, Uvezian would take a 50% interest in the car, or if the car couldn't be purchased within thirty days, Uvezian's money would be returned. The court further found that Kojoyian never in fact returned the money to Uvezian.

There also was a criminal complaint filed against Kojoyian for larceny which was dismissed upon a motion for directed verdict. These are the facts and allegations before the court. Those events which I stated unequivocally as having occurred I find as fact. I would like now to discuss the opposing allegations of each party which go to the merits of any possible fraud claim.

There are two major areas of disagreement in this case. The first involves the written agreement entered into by Kojoyian and Uvezian, and the motivation behind it. The second area involves the question of whether, and under what circumstances, Kojoyian attempted to return the money. As to the former, there are certain questions in my mind as to why the parties entered into this agreement in the first instance. I believe it is clear that the plaintiff sought to invest his money and wanted something in writing to afford legal protection for his advance of the money to Kojoyian. While I am hesitant to suggest that this agreement is anything more than it purports to be on its face, there are incongruencies which make each side's story difficult to believe. On the one hand, we have Uvezian giving $12,500 to Kojoyian, a person whom he had known for no more than two months and with whom he had shared an apartment only briefly. Moreover, the money was allegedly given toward the purchase of an antique automobile which Uvezian had never seen, whose owner he had never met, and upon the mere assertion that Kojoyian's father had dealt with antique cars in the past. This is the plaintiff's story and, while there are numerous examples of more foolish investments by others, the court finds it difficult to understand why a young man with enough business understanding to have a lawyer draft such

an agreement would not also have the common business sense to investigate the object of his investment, particularly where such a large sum of money was involved and which sum represented approximately three-quarters of all the money Uvezian possessed. Although Uvezian says he did investigate the matter after giving Kojoyian the cash, why he did not do so before-hand escapes me. Moreover, the money given to Kojoyian was given in cash, not a bank check. It hardly seems plausible that Uvezian would go to the trouble of protecting his legal rights by hiring an attorney to draft the aforementioned agreement, and then give $12,500 cash to a person who is less than a close friend for the purchase of an automobile he hadn't seen. How did he know the auto was even worth $25,000 as Kojoyian had said? While the story is possible, as I said before it hardly seems plausible. Having had an opportunity to see the witness on the stand and to judge his credibility, I am even less convinced of the veracity of his testimony.

However, I more sternly reject the defendant's version of why the agreement and cash advance came to be. While I suspect that he is telling the truth when he says that the agreement was a sham and both parties knew it, his explanation of why they entered into the agreement is highly suspect. First, Erwin Cantor testified under oath that although he had discussed a possible partnership with Uvezian in the real estate business he ran, at no time was any sizeable investment asked of or required of Uvezian. Thus, the defendant's assertion that Uvezian proposed this sham agreement as a means of avoiding the investment of any money in the business venture would seem to be unsupported by any evidence. More importantly, I am unable to understand why Uvezian would give Kojoyian $12,500 cash even if he did so want to avoid such an investment. Furthermore, why did they go to the expense of hiring a lawyer to draft a sham agreement, when Uvezian could have simply transferred the money to some other account, or secretly kept it himself? Finally, the logic of the story escapes me since if the plaintiff did not want to

invest he merely had to say no, and if he wanted to limit his investment he merely had to say so. I hardly think he would have been asked to prove where he kept his money or what he did with it. The defendant's story seems even less plausible and more spectacular than the plaintiff's. In each story, however, there seem to be elements of truth, but the truth seems to have been altered slightly to suit the purposes of each party. What the precise facts are the court can only speculate as to, and I do not wish to speculate in findings of fact. Let it suffice to say that, where I find that the credibility of the plaintiff's testimony in this regard is suspect, I find that the defendant's is even more so. I do find as fact that plaintiff advanced $12,500 to the defendant. While I do believe the defendant accurately depicted the agreement entered into as a sham, I do not accept his reasons for the basis of the sham. Further, I will not speculate as to the reasons for such an agreement. While I find it difficult to conclude that Uvezian knew that this agreement was a fraud, I find as fact that he reasonably should have known or, in the alternative, was unreasonable in relying on the bare representations of Kojoyian regarding the existence and value of the antique auto in question. Any other finding, I feel, would not be supported by reason or the evidence presented.

Even if my conclusions about the agreement are incorrect, there is still the matter of the alleged "mock robbery". At page 14 of the transcript, Uvezian testified upon direct examination about a meeting between him and Kojoyian at a motel regarding the return of his money.

Q. What did you see when you got to the hotel?

A. When I got to the hotel, I saw Gregory talking with a black person sort of secretively. My brother was in back of me. Someone from across the hall, a guy, with a mask on and his hand in his pocket like he was carrying a gun; Gregory represented to me, when I was in the room, that my money was in a suit case under the bed.

Q. Did he ever show you the contents of the suit case?

A. No. As soon as I got into the room, the guy that he met comes from across the hall, grabbed my brother and threw him in the bathroom. The other gentleman, the guy with the hand in his pocket, he told me to sit on the bed, and I said to Gregory, "Where is the money?" and he pointed to under the bed, and then the guy took off with my money.

Q. This is the same person that you saw talking to Mr. Kojoyian before Gregory knew you were there?

A. That is correct. When I came in, I saw him speaking to this individual like he was almost telling him what to do.

This was the testimony of plaintiff Uvezian regarding why his money was not returned to him. Like much of the other testimony in this case, it certainly is possible that the events he describes might have in fact transpired. However, here too there are seeming inadequacies in the story as presented.

First, the plaintiff, according to his own account, was in a strange hotel to pick up a very large cash sum. The reasonable inference is that he would be concerned and apprehensive about carrying such a large sum of money around with him, and probably even more so when, according to his own testimony, two strangers, one in a ski mask, appeared at the room where he was to pick up his money. His testimony was that when he arrived Kojoyian was speaking secretively with one of the strangers. While this story reads like a piece of detective fiction, assuming the story to be true, why wasn't plaintiff placed on his guard when two strange men appeared at a place where he was to pick up $12,500, in cash, and one was speaking secretively with the defendant, who had the money, and the other was wearing a ski mask carrying himself in such a way as to suggest that he had a firearm? I should think that any reasonable man would have been suspicious if not positively frightened by this scene, as the plaintiff has depicted it. If not, I think he should have been when, after he entered the room, the two men entered, shoved his brother in a bathroom and ordered the plaintiff to sit on the bed. Uvezian certainly had reason to be suspicious at that point. However, according to his testimony, it was only after the two strangers entered the room that he asked "Where's the money?" and at that point they took it and ran. Why does a seemingly sensible man with every reason to suspect mischief, who in fact says he thought one man held a gun in his pocket, ask at that point "Where's my money?" While the absurdity of this situation does not render its occurrence impossible, there is the fact that plaintiff never reported this incident to the police. His testimony that he told the night porter at the hotel is unsatisfactory since there is no indication that plaintiff even tried to pursue any police remedy at all. It seems unlikely that a reasonable man who had been "robbed" of $12,500 by someone he knew, and by two strangers, one of whom he had an opportunity to see closely, would not then call the police. Plaintiff may have had very good reason not to do so, but it would not fit in with his story that the money was for the purchase of a Rolls Royce. For if that were the case, plaintiff would have had every reason to call the police. When he did not, it cast a shadow upon his whole account of the events at the hotel. Moreover, defendant testified that no such meeting ever took place. Plaintiff's brother was never called upon to verify his story that the events he described actually took place. The shortcomings of the plaintiff's account of the hotel meeting and his subsequent actions lead me to the inference that this testimony is somewhat less than accurate, if not totally fanciful.

Nor am I convinced by defendant's testimony that he in fact repaid Uvezian. The state court found as fact that he did not, and I am inclined to be bound by that finding. Whether or not I am required to do so matters not, since I find that there is no evidence to support Kojoyian's testimony regarding the repayment of the money. In

that regard, it is my considered opinion that Attorney Pessia's testimony regarding statements of Deborah Khoury to him are inadmissible as hearsay. Her statements were out of court declarations by a non-party, offered to prove that which was asserted in the statements, and which does not fall within any exception to the federal evidentiary rules of hearsay testimony, by which this court is bound. The only possible exception offered was that of a dying declaration, but such is not the case here, since Ms. Khoury was not at the time of the statements a dying declarant. Moreover, since she was defendant's girlfriend, I would question the reliability of her statements in any event, unless they were made under oath. Thus, Mr. Kojoyian's testimony that he paid Uvezian stands naked and unsupported in the record.

From the foregoing analysis of the evidence and testimony in this case I have come to the findings of which I spoke. While I am of the opinion that normally testimony made under solemn oath and before a judicial officer should never be considered lightly or disregarded casually, it was my judgment in this case that the facts are not totally as either party has alleged. I am reluctant to make such a damning observation, yet all reasonable inferences of fact together with all which is undisputed in the record lead me to the conclusion that neither party's account of the events that have transpired since on or about December 9, 1977 is totally accurate or capable of being accepted as the whole truth. Moreover, it does not appear that the court will ever possess the whole truth in this matter. Nevertheless I have tried to construct, with use of reason and common sense, in the analysis of the record, a set of facts which the court can confidently rely upon in its conclusions of law. While I am certain that each party's account is based on truth, I have been forced to discern that which most reasonably can be called truth, and that which the court feels can only be accurately termed fiction. A finding of fact may be based on reasonable inferences fairly drawn from the facts in question. *U. S. v. Carroll*, 212 F.Supp. 422 (W.D.Ark.1962). As I said

before, it is with reluctance that I attempt to make this dichotomy, for sworn testimony is the foundation upon which all judicial proceedings must rely. However, as the ultimate trier of fact in this proceeding, it is my duty to discern those facts which, by a preponderance of the evidence, seem most plausible in light of reason and the record before me, particularly where the cause of action sounds in fraud and depends so greatly on the facts as they are found. The function of the finder of fact is to choose between conflicting inferences. He may disregard any testimony when convinced that the witness is not telling the truth. Moreover, the court should disregard testimony if it is inherently improbable due to inaccuracy, uncertainty, or bias. *In re Brown*, 412 F.Supp. 1066, 1070 (D.Okl.1975).

## CONCLUSIONS

■ Plaintiff has the burden of proving that the debt owed was incurred by reason of positive fraud in order to have that debt excepted from discharge in bankruptcy. 11 U.S.C. § 523(a)(2); *In re Jones*, 3 B.R. 410, 3 Bank.Rep. 401 (Bkrtcy.W.D.Va.1980); *Murphy v. Wheatley*, 360 F.2d 180 (5th Cir. 1966). The elements of fraud are: (1) a false representation by the debtor, (2) known at the time to be false, (3) made with the intention and purpose of deceiving the creditor, (4) which was reasonably relied upon by the creditor and, (5) which resulted in a loss or damage to the creditor as a result of the false representation. *In re Houtman*, 568 F.2d 651, 655 (9th Cir. 1978).

■ Based on the facts adduced above it is clear that the plaintiff must fail. While it may be that Kojoyian did knowingly make false statements, and even if he made them with the required intent to deceive, it has been found that Uvezian would have been unreasonable in relying on those representations. Although I am of the opinion that any falsity in the defendant's representations was known to the plaintiff at the time of the transaction, even if we assume arguendo that this was not the case, the plaintiff should not have reasonably relied on the bare assertions of defendant. Where such a large sum of money was involved,

and was to be transferred in cash to defendant, the plaintiff would have been unreasonable in relying on the defendant's representation alone that such an automobile existed, that it was for sale, and that it could be had for $25,000. Moreover, this was not a situation where plaintiff's faith or reliance would have been well placed. Defendant did not appear to be such a close friend or relative that plaintiff would have been justified in relying on his word, and nothing more. Finally, where the facts indicate that this transaction was something other than it appeared to be, and both parties seemingly knew or should have known of this fact, fraud, for purposes of § 523(a)(2), will not lie. Where, as here, it appears that plaintiff as well as defendant has not been totally forthright and open in his account of the events which surround the transaction, the court finds it difficult to have a debt excepted from discharge. A bankrupt is entitled to a fresh start and should not be burdened with non–dischargeable debts unless the evidence clearly indicates that they should be excepted from his discharge. Such is not the case here, and I am of the opinion that defendant's debt to the plaintiff should be discharged. SO ORDERED.